**SPILKER v. HANKIN.**

No. 10576.

United States Court of Appeals
District of Columbia Circuit.

Feb. 23, 1951.

Alfred Goldstein, Washington, D. C., for appellant.

Thomas B. Scott, Washington, D. C., with whom Mr. Charles W. Mander, Washington, D. C., was on the brief, for appellee.

Before CLARK, FAHY and WASHINGTON, Circuit Judges.

WASHINGTON, Circuit Judge.

This was a suit against Mrs. Spilker upon five of a series of seven notes given by her to Mr. Hankin. After a jury trial in the Municipal Court, judgment was entered for the defendant. This was reversed by the Municipal Court of Appeals for the District of Columbia. We allowed an appeal to this court.

The factual situation is thus described in the opinion of the Municipal Court of Appeals:[1]

"This appeal arises from a judgment denying recovery on five promissory notes. The notes in question had been executed by appellee Mrs. Spilker for legal services rendered her by appellant Hankin in a divorce action. In the court below Mrs. Spilker defended on the ground of misrepresentation by Hankin when the notes were signed, and a jury returned a verdict in her favor. Hankin brings this appeal, assigning some fifteen errors. The decisive question is whether Mrs. Spilker is precluded by the doctrine of res judicata from denying liability on the notes.

"Without recapitulating all the facts presented in the record and the contradictory testimony of the witnesses, it appears that Mr. Hankin was engaged by Mrs. Spilker to represent her in a divorce action and in an ensuing property settlement. Other attorneys were also engaged by her at various stages of the divorce litigation, with Mr. Hankin acting as co-counsel. It seems undisputed that he did a major portion of the work in the case, although in the end he did not take the case to trial. While he was serving as co-counsel with the attorney who finally tried the case, Mr. Hankin obtained from Mrs. Spilker seven promissory notes for a total of $2000, made out to him, five of which are the subject of this litigation.

"These seven notes were executed on December 9, 1946 in the office of another attorney. They were made out in a numbered series extending from 1 to 7. Number 1 was a demand note for $500, and each of the others was for $250. The maturity dates on these latter notes fell on three month intervals from date of execution, with number 7 maturing on June 9, 1948.

"The demand note was paid a few days later, but when note number 2 fell due, it was not paid. Hankin filed suit thereon, and after a trial on the merits recovered judgment. The record in that action has been incorporated into the record here. Because of the question of res judicata, it is necessary to recount the proceedings in that first suit at some length.

"The action was begun by pleading the note in full. In her answer, Mrs. Spilker said 'that plaintiff, as such attorney of record, refused to proceed in said divorce action involving a property settlement, unless the defendant would execute the note, which is the basis of plaintiff's suit, that the defendant acting under duress and in fear of losing her divorce action and property, was unlawfully coerced into executing the said note.' She also defended by saying that she had to engage other counsel at a cost of $1250, that the note in suit was for an exorbitant and unconscionable fee for legal services, and that she had already overpaid Mr. Hankin for his services.

"Thereafter, Hankin filed a motion to strike the answer, chiefly on the ground that it contained scandalous and libelous matter. But he also stated that his refusal to proceed with the case unless the note were signed was neither 'duress' nor 'unlawful coercion.' In her reply to the motion, Mrs. Spilker stated: 'no relief can be granted where a contract lacks the essential element of consent,' and that since the note was executed under duress it was voidable. The motion to strike was overruled.

1. Reported in 72 A.2d 45, 46.

"Before trial Mrs. Spilker amended her pleadings by filing a counterclaim seeking recompense for the amount she had paid the attorney who took her case to trial, and she sought a determination that the amount already paid Hankin was to be considered full payment for the services. She also demanded 'that all the notes in the total of Two Thousand Dollars, $2,000.00, secured under duress from the defendant by plaintiff, including the note in suit, be declared null and void and of no effect * * *'

"The case was tried by judge and resulted in a general finding in favor of plaintiff Hankin, who was awarded judgment on the note, and a disallowance of the counterclaim. Mrs. Spilker took no appeal. The issue was first raised by plaintiff Hankin in a motion for summary judgment, supported by affidavit. The motion was denied on the grounds that '(a) it did not appear that the moving party was entitled to judgment as a matter of law, and (b) it did not appear that there was an absence of a genuine issue remaining for trial.' Accordingly the case proceeded to trial, before a jury.

"Mrs. Spilker's chief defense in the present action was that of misrepresentation, rather than duress and coercion. She pleaded: 'that the execution and delivery of the said notes were obtained and defendant's signature thereto induced by the plaintiff upon the misrepresentation that if execution and delivery of the said notes were not made the best interests of defendant in said litigation would not be served * * *' She also stated: 'that she had, prior to the execution of said notes, paid plaintiff in full for all professional services performed by him on her behalf and there was nothing due and owing him and no good and sufficient consideration for the alleged signing and execution of said promissory notes.' In other words, she was again denying the validity of the contract for lack of mutual assent in its execution, but this time for misrepresentation rather than duress and coercion. She also claimed failure of consideration and payment for plaintiff's services to the

extent of their value." (Footnote omitted) 72 A.2d at pages 46–47.

After thus reciting the facts the Municipal Court of Appeals stated that "these were substantially the same issues defendant had raised in defense to the action on note number 2 and therefore, under the rule of res judicata, not again available to her unless she came within one of the exceptions to that rule." 72 A.2d at page 47. The court then examined at length the authorities relative to res judicata, and concluded: "Mutuality of assent to the basic contract itself having been specifically placed in litigation by her defenses and counterclaim in the first case, she was thereafter estopped from relitigating the same question. On that issue she had her day in court and lost; whatever other defenses she may have had to the other notes, the right to deny assent was not again available to her. This was not a situation where an equitable defense and counterclaim were never filed, or one in which the defense went only to part of the contract. Under the circumstances of this case the first judgment was conclusive on the issue of assent." (Footnotes omitted). 72 A.2d at page 49. The cause was thereupon reversed and remanded with instructions to set aside the judgment in favor of defendant and to enter judgment on the notes for plaintiff.

We agree with much that the learned Municipal Court of Appeals has said with regard to the principles of res judicata. We agree, for example, that in successive suits on a series of notes, defenses failing in the first suit ordinarily are foreclosed to the defendant in subsequent litigation. Restatement, Judgments § 68, Comments c, m, Illustration 5. But, with all respect to that court, we consider that weight should have been given to a factor not mentioned in its discussion of the case, that is, the fiduciary relationship of attorney and client which existed between the parties. In a very real sense attorneys are officers of the courts in which they practice; and clients are wards of the court in regard to their relationship with

their attorneys. This factor is one of high significance in the present context.

■ The doctrine of res judicata is but the technical formulation of the "Public policy * * * that there be an end of litigation; that those who have contested an issue shall be bound by the result of the contest; and that matters once tried shall be considered forever settled as between the parties." Baldwin v. Iowa State Traveling Men's Ass'n, 283 U.S. 522, 525, 51 S.Ct. 517, 518, 75 L.Ed. 1244. This policy has long been a tenet of the common law, and even finds expression in the Constitution of the United States, in the full faith and credit clause. Experience has taught that as a general rule there is no reason why the doctrine of res judicata "should not apply in every case where one voluntarily appears, presents his case and is fully heard * * *."[2] But rules and policies such as these must be weighed against competing necessities: situations may arise which call for exceptions. Recently this court decided a case involving such a situation, and held that "Where the application of the judicial doctrine res judicata would be inconsistent with the method devised by Congress the doctrine will not be enforced by the courts. Kalb v. Feuerstein, 1940, 308 U.S. 433, 444, 60 S.Ct. 343, 84 L.Ed. 370. It is for this reason we hold against the contention of petitioners, and not because of lack of any of the elements which usually make out a case for the application of res judicata. The doctrine is not to be used where the circumstances create a semblance of conditions for its application but to apply it would submerge the plan of Congress for the administration and enforcement of its policy." Denver Building & Construction Trades Council, v. N. L. R. B., 87 U.S.App.D.C. 293, 186 F.2d 326, 332.[3]

■ Other policies, not embodied in a congressional mandate, have compelled the same result. For example, while the courts of this country, as a general rule, have given res judicata effect to judgments of foreign countries,[4] there have been situations where American courts have refused such recognition for policy reasons.[5] De-

---

2. Baldwin v. Iowa State Traveling Men's Ass'n, supra.

3. In Kalb v. Feuerstein, cited in the quoted passage, the Supreme Court said: "It is generally true that a judgment by a court of competent jurisdiction bears a presumption of regularity and is not thereafter subject to collateral attack. But Congress * * * may by specific bankruptcy legislation create an exception to that principle and render judicial acts taken with respect to the person or property of a debtor whom the bankruptcy law protects nullities and vulnerable collaterally." (Footnotes omitted). 308 U.S. at pages 438–39, 60 S.Ct. at page 346.

4. See Reese, The Status in this Country of Judgments Rendered Abroad, 50 Col. L.Rev. 783. Such judgments are, of course, not governed by the full faith and credit clause, U.S.Const., Art. IV, Sec. 1, which precludes considerations of local policy in determining whether a judgment of a sister state should be given effect. Fauntleroy v. Lum, 210 U.S. 230, 28 S.Ct. 641, 52 L.Ed. 1039. That there may be instances where *national* policy requires that an exception be read into the sweeping command of the full faith and credit clause, see the opinion of the late Justice Rutledge, concurring in People of State of New York ex rel. Halvey v. Halvey, 330 U.S. 610, 619–620, 67 S. Ct. 903, 91 L.Ed. 1133. See also, Reese & Johnson, The Scope of Full Faith and Credit to Judgments, 49 Col.L.Rev. 153, 177–78.

5. See, e. g., Hilton v. Guyot, 159 U.S. 113, 16 S.Ct. 139, 40 L.Ed. 95; Hohner v. Gratz, C.C.S.D.N.Y.1892, 50 F. 369. In Hilton v. Guyot the Supreme Court held that a French judgment should not be given conclusive effect in a case where an American citizen was sued by a French plaintiff in a French court and lost. The Court noted that the French courts would not give conclusive effect to an American judgment, if the circumstances had been reversed, and concluded that a rule of reciprocity should be applied. A consideration perhaps underlying the Court's determination was its desire to protect American defendants in foreign courts. Whether the Supreme Court itself would reach the same result today, whether we agree with the particular decision, is, of course, not here in issue. See Reese, The Status in this Country of Judgments Rendered Abroad, 50 Col.L.Rev. 783, 790–93, 796–98.

cisions of this sort demonstrate that res judicata, as the embodiment of a public policy, must, at times, be weighed against competing interests, and must, on occasion, yield to other policies.

Fee contracts between attorney and client are a subject of special interest and concern to the courts. They are not to be enforced upon the same basis as ordinary commercial contracts. Especially is this true where, as in this case, a contract beneficial to the attorney is executed long after the attorney-client relationship has commenced, when the position of trust is well established, and the litigation involved is reaching its culmination. "In some jurisdictions it has been held that such agreements are void. In other states contracts of such character are held to be affirmatively invalid on the ground of fraud, and the burden is on the attorney to show the fairness of the transaction in that the compensation provided for does not exceed a reasonable compensation for the services rendered or to be rendered." In re Howell, 215 N.Y. 466, 109 N.E. 572, 574. Many courts, including the courts of this jurisdiction, have gone so far as to say that they are attended by a presumption of invalidity and overreaching.[6] They are always subject to the close scrutiny of the court whenever judicial enforcement is sought. "The rule is founded in public policy, and operates independently of any ingredient of actual fraud or of the age or capacity of the client, being intended as a protection to the client against the strong influence to which the confidential relation naturally gives rise. * * *" Thomas v. Turner's Adm'r, 87 Va. 1, 12 S.E. 149, 153, 668. Certainly this policy cannot be thwarted or overcome by having the client execute a promissory note or a series of promissory notes reflecting the attorney's charge to his client. When he seeks to enforce such a note the attorney cannot rely upon the usual commercial principles relative to negotiable instruments; he must rely upon the same basic considerations as if he were asking

the court to enforce a fee arrangement not reflected in a note or notes.

Ordinarily the matter of a fee will be litigated but once, and the first determination will be conclusive. Were this merely a suit upon the original judgment we would, of course, consider res judicata to be applicable. But here we have a series of notes, one brought into litigation prior to the others. The original suit was for a much smaller amount, and some of the issues here in question were only indirectly involved in it. And it is the attorney who seeks further court aid with regard to his fee. The fee arrangement in question was reduced to promissory notes shortly before the termination of the litigation in which the attorney acted for the client, and appears to have been required by the attorney as a condition of his remaining in the case. While we do not mean to imply that an attorney can never protect himself with regard to his fee by making an arrangement of this sort, we consider that when under such circumstances the attorney twice brings the matter into court, the requirements of justice are better served by permitting reexamination of the merits than by treating the prior suit as foreclosing the matter. We think that the client should be permitted to make any legal or equitable defense to the remaining notes which appeals to the conscience of the court.

In this regard we must consider another factor not fully dealt with by the Municipal Court of Appeals: When the first suit came before Judge Quinn of the Municipal Court he found for the plaintiff on the note there involved, which was in the amount of $250. He also dismissed the defendant's counterclaim. The case was tried without a jury. No findings or conclusions of law were entered. The precise grounds for the court's action with regard to the counterclaim are thus not set forth. When plaintiff brought suit on the remaining notes and moved for summary judgment, he stated that the facts with respect to the court's

6. Willoughby v. Mackall, 1 App.D.C. 411; Whiting v. Davidge, 23 App.D.C. 156; Rizzi v. Fanelli, D.C.Mun.App.1949, 63 A.2d 872; Merryman v. Euler, 59 Md. 588; Stiers v. Hall, 170 Va. 569, 197 S. E. 450; cases collected in 19 A.L.R. 847; 5 Am.Jur.Attys. §§ 159, 160.

action in the first suit could be resolved "by a reference of this motion [i. e., plaintiff's motion for summary judgment] to the Judge who presided at the trial or by having him testify on the facts relating to the present motion." The motion was thereupon referred to Judge Quinn, who denied it. Plaintiff thereafter requested that Judge Quinn make findings of fact and conclusions of law. This request was denied as being premature, for the reason that "there has been no trial upon the facts as yet in the case at bar."

■ This action by Judge Quinn in the second case appears to us highly pertinent in determining the scope and effect of the action which he took in the first case in dismissing the defendant's counterclaim. That counterclaim, which sought the cancelation of the entire series of notes, was in essence an appeal to the equitable powers of the court. The exercise of those powers rested in the court's informed discretion. The court may well have decided not to exercise them, and to dismiss the counterclaim, in order that the issues presented might be determined when and if the plaintiff should decide to bring suit on the remaining notes. Such an interpretation is entirely consistent with Judge Quinn's action in the second case in refusing to grant plaintiff's motion for summary judgment, as well as his denial of plaintiff's request for findings of fact and conclusions of law. In any event, it is for the plaintiff here—the person seeking the benefit of the doctrine of res judicata—to sustain the burden of showing that all of the issues were determined in his favor in the earlier action. Restatement, Judgments, § 68, Comments k, 1; Russell v. Place, 94 U.S. 606, 24 L.Ed. 214. Judge Quinn evidently did not consider that he had done so. On the contrary, he found that there was a genuine issue of material fact remaining for trial.

■ We do not mean to infer that the determination of the trial court on questions of this sort should be regarded as necessarily conclusive, or not subject to the normal process of correction or modification on appeal. In this case, however, for the reasons set forth above, we consider that Judge Quinn was acting within his authority when he denied the motions made by the plaintiff in the second suit and permitted the suit to go to trial. Where the client has appealed to the equitable powers of the court for relief in a situation such as the present, the door should be kept open for that purpose to the maximum extent consistent with good judicial administration.

We must therefore reverse the judgment of the Municipal Court of Appeals and remand the cause to that court for further proceedings not inconsistent with this opinion. Such action may include consideration of any remaining contentions of the parties not discussed in the opinion rendered by the Municipal Court of Appeals.

Reversed and remanded.