## KNIGHT v. SONTAG.

### No. 1363.

Municipal Court of Appeals for the
District of Columbia.

Argued Aug. 17, 1953.

Decided Sept. 11, 1953.

As Modified Sept. 22, 1953.

———◆———

C. Louis Knight, Washington, D. C., pro se.

J. Kenton Chapman, Washington, D. C., for appellee.

Before CAYTON, Chief Judge, and HOOD and QUINN, Associate Judges.

CAYTON, Chief Judge.

Plaintiff, an attorney, sued a former client on a promissory note. Defendant pleaded lack or failure of consideration, fraud, duress, and undue influence. He also filed a counterclaim demanding the return of money paid to plaintiff. The jury returned a verdict for defendant on plaintiff's claim and for defendant on his counterclaim. Bringing this appeal, plaintiff first assigns as error the denial of his motion for directed verdict on the note and counterclaim, and of his motion for judgment non obstante veredicto.

 It is necessary to examine the transaction between the parties from its inception. This is so because of the nature of the defenses; also because no special sanctity surrounds a promissory note in the hands of an original payee. At the suit of payee against maker, the note is subject to any of the defenses available against enforcement of the original contract.[1]

 In determining whether plaintiff's motions were proper, the evidence must of course be viewed in a light most favorable to the defendant.[2] There was evidence from which the jury could have found the following facts. In January 1949, defendant engaged plaintiff and one Olverson to represent him in connection with his claim against the estate of his deceased mother, and agreed "to pay said attorneys for their services in securing payment of said legacy an amount equal to twenty-five per cent (25%) of any judgment obtained in my favor or of any settlement out of court to which I shall agree." The principal assets of the estate consisted of land in Fairfax County, Virginia, and two houses in the District of Columbia. With the concurrence of Olverson, plaintiff filed a suit for defendant in Fairfax County in which it was sought to have the executors named in the will removed and plaintiff named as administrator. This suit was dismissed by the Virginia court in July 1949.

Later, without the knowledge or consent of Olverson, plaintiff filed a second suit on behalf of defendant in Virginia. This was a suit to have the will construed and to require the executors to dispose of the property in accordance with the will. Olverson did not learn of this suit until later and though he attended the hearing of the second suit he did not participate in the proceedings. Like the first, this suit was decided against defendant. Plaintiff advised his client (the defendant) to take an appeal but at that time the client did not agree to do so.

In May 1950, defendant by letter discharged plaintiff as his attorney. But the following month defendant inquired if plaintiff would represent him in an appeal from the second suit, and plaintiff replied that he would take the appeal if defendant would sign a paper he, the attorney, had prepared. Defendant took exception to part of the document, but being assured by the attorney that "Oh, we can change that any time we want to," signed the paper and left, thinking that plaintiff was again his attorney.

The next month, defendant inquired of plaintiff how the appeal was progressing and was then informed by plaintiff that he

1. Sheriger v. Gruner, D.C.Mun.App., 34 A.2d 35.

2. Baltimore & O. R. Co. v. Postom, 85 U. S.App.D.C. 207, 177 F.2d 53; Sorivi v. Baldi, D.C.Mun.App., 48 A.2d 462.

still was not his lawyer and that in order "to lay more groundwork" it would be necessary for defendant to sign another paper. This was also prepared by plaintiff and defendant signed it before a notary. The paper was in fact a promissory note (not the one here in suit). Defendant did not understand the full legal effect of the paper but signed it anyway. He testified: "I trusted him. He was my attorney. * * so, I let it slide." After the note was signed there was some discussion concerning the case and plaintiff again denied that he was defendant's attorney and then said that he would not take the appeal unless defendant gave him $200 for expenses. Defendant then borrowed that amount and offered it to plaintiff who refused it and imposed a further condition on his accepting defendant as a client: that the other so-called minor heirs must join in the appeal. Defendant failed to secure their consent and plaintiff said, "Well, that ends it."

Defendant then dealt directly with his brother and sold him his interest in the estate for $3,500, receiving a down payment of $500. Defendant then paid plaintiff $125 in July 1950. He protested to plaintiff (as he did at the trial) that he did not owe him any fee. But he said: "I knew he retained these papers. These were papers that were obtained from me by repeated broken promises to be my attorney. Nevertheless, he had the papers and I thought, even though they were obtained by false—by misrepresentation; nevertheless, he had them and I was sure that at some future date he would make a law suit against me on the basis of those papers and I was sick of law and law suits. I wanted peace. If I had to buy it, I wanted peace." Plaintiff asked defendant to sign another note for $875, less $125, but defendant refused.

Soon thereafter, plaintiff sued defendant for $1,675 for professional services. Defendant went to plaintiff and asked him "what his terms were to call off the suit. I was so sick of law suits, I wanted to completely get out of it if I had to buy out." Plaintiff's terms were that defendant pay $19.00 cash and sign another note. Defendant at first refused, saying "Well, you have lots of papers that I had signed—you made me sign lots of papers. I have nothing at all with your signature on." To meet this objection plaintiff drew up a paper in which he agreed to dismiss the suit upon defendant's signing the note and paying $19.00 covering the costs of the suit he had filed against defendant and costs of a Virginia suit filed in behalf of defendant. The note signed was for $750 plus interest. The $1,675 suit was dismissed without prejudice. When defendant did not make the first payment on the note, this suit was filed.

■ As we said at the outset, plaintiff's claim on the note was open to the several defenses presented. And it is clear that on the basis of the evidence adduced in support of those defenses the trial judge would have had no right to take the case from the jury. Remembering that plaintiff was an experienced lawyer and defendant a layman, it cannot be said that the claim asserted in plaintiff's first suit, for services, was as a matter of law reasonable and not merely vexatious and therefore the withdrawal of that suit, without more, constituted good consideration for the note.[3] In that connection the jury had ample evidence from which to find that plaintiff had accomplished nothing for defendant, and had earned no fee, either under the original contingent-fee agreement, or on a quantum meruit basis. The jury was also entitled to find that the transaction was tainted by duress and misrepresentation.[4]

Plaintiff devotes much of his argument to his contention that the evidence was insufficient to support a finding of fraud (as disclosed by the jury's answer to a special

---

3. See Snyder v. Cearfoss, 190 Md. 151, 57 A.2d 786. See also Spilker v. Hankin, 88 U.S.App.D.C. 206, 188 F.2d 35, which we discuss later in this opinion.

4. As to duress generally, see Rizzi v. Fanelli, D.C.Mun.App., 63 A.2d 872 and cases there cited; see also our discussion of the charge on the subject, infra, and our reference to Spilker v. Hankin.

interrogatory submitted by plaintiff). But it is clear from what we have said that the other defenses were made out; hence defendant could prevail without express proof of technical fraud.

■ Much of what we have said applies as well to plaintiff's assignment of error regarding defendant's counterclaim. Since there was evidence to support a finding that plaintiff had earned nothing under the contract of employment and had performed no service subsequently, the jury was entitled to find that there was no consideration for the $125 fee paid to plaintiff, and that defendant was entitled to have it refunded.

■ Next we consider several criticisms of the charge to the jury. Appellant says the trial judge should have spelled out for the jury the act or acts constituting duress "and what facts it would be necessary for the jury to find in order to support a finding of duress." The criticism is not well taken. At least three times during his charge the judge covered the subject of duress and also gave the following definition: "Duress consists in subjecting a person to pressure which overcomes his will and causes him to comply with the demands to which he would not have yielded if he had been acting as a free agent and provided that the pressure is applied at the time of the happening of the act complained of." The subject was covered accurately and as favorably to appellant as he had a right to demand. We know of no rule of law which required the judge to select from the evidence and enumerate to the jury the factual components of duress.

■ Appellant says the trial court erroneously refused to charge the jury that his alleged promise to appeal the Virginia decision would not constitute duress affecting the execution of the note by the defendant. The short answer to this contention is that nowhere in the pleadings or the evidence was any such issue presented. The defense of duress was not based on a promise to appeal the Virginia decision (except in an indirect and incidental way),

but basically on other entirely separate transactions and conversations. The requested instruction could only have served to confuse the jury and the judge was right in refusing it.

■ Appellant says there was error in refusing to instruct the jury "that the fact that plaintiff sued defendant in October 1950 to obtain payment for the value of professional services rendered by plaintiff to defendant does not constitute duress because plaintiff had a legal right to sue." In the first place, we note that the court did tell the jury in this connection, "and I further instruct you that doing what one has a right to do does not constitute duress." Under the evidence it would not have been proper to flatly tell the jury that appellant had a right to sue defendant for $1,675, for the validity and good faith of that claim was one of the most vigorously contested issues at the trial: appellant insisted he had filed the suit in good faith to recover for services rendered, while appellee just as earnestly challenged that statement and repeatedly insisted that the claim was without substance. Hence the trial judge correctly refused to grant an instruction which, on a major issue, would sanction appellant's position and reject the position taken by his adversary.

■ Appellant also complains that the trial judge included in his charge the substance of what was said in a recent decision in an attorney-client case, Spilker v. Hankin, 88 U.S.App.D.C. 206, 188 F.2d 35. The judge told the jury: "Attorneys are officers of the courts in which they practice, and clients are wards of the courts in regard to the fiduciary relationship which exists between them and their attorneys." He also instructed: "fee contracts between attorney and client are not to be considered upon the same basis as ordinary commercial contracts; especially is this true where a contract beneficial to the attorney is executed long after the attorney-and-client relationship is commenced and when the position of trust is well-established and the litigation involved is reaching its culmination. Many courts, including the courts of

this jurisdiction, have gone so far as to say that they are attended by a presumption of invalidity and overreaching. This policy cannot be thwarted or overcome by having the clients execute a promissory note or a series of promissory notes reflecting the attorney's charges to his client." Obviously, these statements of law are not subject to challenge, since they were taken from the careful enunciation, by our highest appeals court, of the law and policy which must govern cases like this. But appellant says this language was inapplicable because of two basic factual differences in the respective situations. He says (1) that in the Spilker case the notes were executed as part of a fee arrangement between attorney and client, while in this case the note was executed as part of a compromise settlement of a law suit. But that states only his side of the controversy; the position taken by defendant is essentially the same as that of the client who signed the notes in the Spilker case: that the note was without consideration because the attorney had not earned the fee for which it was given, or for which the earlier suit had been filed. He says (2) that in the Spilker case the notes were signed while there was a subsisting attorney-client relationship, while here the note was signed long after the relationship had ended. But again appellant overlooks the fact that there was evidence tending to show that the attorney-client relationship had not then been completely or finally severed, but was being continued or revived.[5] Indeed there was ample evidence that all of plaintiff's demands upon defendant (the first note, the $1,675 fee-suit, and the final note on which this suit was based) were for services rendered as attorney. Hence having been in a fiduciary capacity he was subject to the restrictions set out in the Spilker decision. Moreover, we note that the judge did tell the jury that, "if they find from the evidence that the plaintiff was not the defendant's attorney on November 3, 1950, when the note was signed and had not been his attorney for some time prior to the said date, the execution and delivery of the note is not attended by any presumption of invalidity or overreaching." There was no error in this set of instructions; indeed they were probably more favorable to plaintiff than was required.

■ The case was submitted to the jury for decision by general verdict; but on the insistence of appellant they were also given special interrogatories to answer. The first was whether the preponderance of the evidence proved that plaintiff had made a representation to defendant contemplating that defendant in reliance on such representation would sign the note sued upon. The interrogatory also enumerated four elements constituting fraud and misrepresentation. (This interrogatory the jury answered Yes.) Appellant complains that the judge struck therefrom the following additional question: "If your answer is 'Yes', what was such representation and when and by whom was it made?"

■ The second interrogatory was, "Does a preponderance of the evidence prove that the defendant was subjected to duress at the time he made and delivered the note?" (This too the jury answered Yes.) Appellant complains that the judge struck the following additional question: "If your answer is 'Yes', what act or acts constituted such duress?" We are not aware of any rule or practice which requires a judge to demand that a jury spell out the ingredients of its findings. Rule 49(b) of the Municipal Court covering special interrogatories is permissive, not mandatory.[6]

■ Error is also charged because the trial judge permitted defendant to reopen his case and offer additional testimony

5. For example, defendant testified more than once: "Mr. Knight was my attorney. I trusted him."

6. See Marcus Loew Booking Agency v. Princess Pat, 7 Cir., 141 F.2d 152; Car & General Ins. Corp. v. Cheshire, 5 Cir., 159 F.2d 985; S. S. Kresge Co. v. Holland, 6 Cir., 158 F.2d 495; Smith v. Welch, 10 Cir., 189 F.2d 832.

after he had rested and appellant had moved for an instructed verdict. We need not repeat the universally accepted rule that such matters are in the realm of discretion and not subject to reversal except for abuse of such discretion. The same is true concerning another ruling allowing defendant to make an amendment to his counterclaim.

Appellant sought to take the deposition of Mr. Olverson who had represented appellee as co-counsel. This was opposed on the ground of privilege, as well as for other reasons. The trial court refused to permit the taking of the deposition. At the trial Olverson was produced as a witness for defendant (appellee) and was fully cross-examined by appellant. It seems plain that appellant was not prejudiced.

Other claims of error have been examined and found to be without substance.

Affirmed.